IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :     CRIMINAL ACTION
                              :
            v.                :
                              :
TYRON ELLERBE                 :     NO. 12-168-1


REDACTED MEMORANDUM


McLaughlin, J.                             October 10, 2012


        The defendant is charged with two counts of possession
of a firearm by a convicted felon and two counts of making, and
aiding and abetting making, false statements to a firearms
licensee ("FFL").  These charges arise from the purchases of two
guns on September 7 and 8, 2011, by Lamia Smith, allegedly for
the defendant, Tyron Ellerbe.

        The defendant has moved to suppress the gun and other
physical evidence seized from his home on September 12, 2011.
The Court held an evidentiary hearing on September 21, 2012, and
will now deny the motion.


I.   Findings of Fact

        Agent Mark Schmidheiser is a member of the State
Attorney General's Gun Violence Task Force.  He became a member
of the Gun Violence Task Force in 2002, after working as a police
officer for 25 years.  On September 8, 2011, he received
information from an employee of the Firing Line, a gun shop

located at 1500 South Front Street.  The employee informed the
agent that there was a female in the store who the employee
believed was trying to straw purchase a gun.  Agent Schmidheiser
was told that the female told the employee that she had purchased
a gun the day before at another gun shop and was looking for
another gun because the one she bought the day before was too big
for her hand.  The agent had dealt with the Firing Line gun shop
employee many times in the past.

Agent Schmidheiser then went to the Firing Line gun
store and parked in the lot.  While he was doing so, he received
another call from the employee who said that the female, later
identified as Lamia Smith, was exiting the store because she was
short on money.  He described her as wearing a pink shirt and
black pants.  Agent Schmidheiser observed a woman matching that
description come out of the store and walk across Front Street.
She got into a light colored Toyota.  The Toyota was not parked
in the lot of the gun store, even though there were many
available parking spots.  Agent Schmidheiser followed the Toyota
over to a Wawa and he observed a man he later identified as the
defendant get of the vehicle and go into the Wawa.  He wrote down
the tag number of the vehicle.

Agent Schmidheiser contacted his partner, James
Henwood, and told him what was happening.  Agent Henwood was at
55th & Pine when he got the call.  Agent Schmidheiser told Agent

Henwood that the defendant appeared to use the ATM machine in the Wawa.  About 20 minutes later, Agent Schmidheiser observed Lamia Smith walk back into the parking lot and go into the Firing Line again.  The Toyota again did not park in the parking lot.  About 10 to 15 minutes later, Agent Schmidheiser received a call from the same employee who told him that Ms. Smith was leaving the store and the employee had put the gun into a brown bag.  Agent Schmidheiser observed her come out of the store carrying the brown bag and walk out of the parking lot.  He followed her around the corner where he observed her walk up to the Toyota that was driven by the defendant.  She tapped on the trunk and the trunk popped open.  She placed the gun in the trunk, closed the trunk, got into the car, and they both drove off.

Agent Schmidheiser started to follow the defendant and Ms. Smith.  Around this time, Agent Henwood caught up to Agent Schmidheiser.  Agent Henwood, who had been assigned to the Philadelphia Gun Violence Task Force ("GVTF") since 2007, ran the tag of the car and informed Agent Schmidheiser by phone that the car was registered to Tyron Ellerbe.  The two agents followed the car.  At one point, Agent Henwood was able to drive up beside the car and to look into the car and saw the defendant driving. There is a wide turning area near there for two lanes of traffic. The agents lost the car for a short time but then found the car. The car was parked in front of the address of the owner of the

car.  The car was unoccupied and there was nobody in the area.
Three to five minutes passed between the time the agents lost
sight of the vehicle and then found it unoccupied.

The employee of the store had also told Agent
Schmidheiser that Ms. Smith said that she had bought a gun the
day before at the Shooter Shop which is located at 2001 Allegheny
Avenue.  The two agents then went to the Shooter Shop and
recovered the paperwork for the gun that was purchased on
September 7 -- a .45 automatic Taurus pistol.  They then went
back to headquarters.  They started to do a background check on
the defendant, the owner of the vehicle.  It came back that he
was a convicted felon on state parole.  Lamia Smith had no
arrests and they discovered that her address was close to the
defendant's home.  At that point, Agent Henwood contacted Joseph
Gillespie of state parole.

Joseph Gillespie is a parole supervisor with the Board
of Probation and Parole of the Fugitive Unit ("Parole Board").
He has been with the Parole Board for 16 years, and 10 years with
the Fugitive Apprehension and Search Team.  He has been a
supervisor of that unit for seven years.  The Fugitive Unit is a
specialized unit of the Pennsylvania Board of Probation and
Parole whose mission is to apprehend parole absconders or
fugitives.  The unit is also tasked with handling high risk
entries and arrests and  investigations.  All members of the Unit

4

are deputized U.S. Marshals and part of the fugitive task force. They coordinate with most agencies in the area.

Agent Gillespie has had contact with Agent James Henwood prior to September 8, 2011.  They have conducted investigations and have had mutual investigations with offenders who were under the jurisdiction of the Parole Board at the time that there was an investigation ongoing.  In the past, Agent Henwood had provided Agent Gillespie with information regarding parolees upon which he had acted.  He was contacted by Agent Henwood on September 9th.

Agent Henwood explained to Agent Gillespie that he was conducting an investigation and was trying to confirm that Tyron Ellerbe was under the jurisdiction of the Parole Board.  Through several conversations, Agent Gillespie learned from Agent Henwood that they had information and had conducted surveillance of Mr. Ellerbe on September 8 at a gun shop called the Firing Line and that a female had accompanied him and purchased a handgun and placed that handgun in the trunk of the vehicle that was registered to Mr. Ellerbe.  Agent Gillespie learned that during the surveillance, an agent saw the female leave the gun shop and was accompanied by Mr. Ellerbe to a Wawa where Mr. Ellerbe made a cash withdrawal and then went back to the Firing Line.  The female went in and conducted a gun purchase and came out and placed the gun that she had purchased in the trunk of the car

that Ellerbe was driving.  Agent Henwood told Agent Gillespie
that their investigation revealed that she had purchased a
handgun at the Shooter Shop the day before, which would have been
September 7.  He received information from Agent Henwood that in
their surveillance, they identified Mr. Ellerbe as the driver of
the vehicle.

Agent Gillespie then conducted an investigation to make
sure that Mr. Ellerbe was in fact on parole under the supervision
of the Parole Board.  He confirmed that fact and contacted the
defendant's acting parole agent, Mr. Mullany.  Mr. Ellerbe, as a
convicted felon and being under the jurisdiction of the Parole
Board, per his release conditions, is forbidden from being in
possession of any weapons, specifically firearms.  Agent
Gillespie did most of this work on Friday by way of telephone
because the computers were down because of major flooding in
Harrisburg.  There was a question about the defendant's address.
Agent Mullany had recently given Mr. Ellerbe permission to move
but the address that was listed was in a different area.  Agent
Gillespie had to confirm orally with Agent Mullany what was Mr.
Ellerbe's approved address.  Agent Gillespie confirmed that Mr.
Ellerbe was living at the approved address.

Agent Mullany told Agent Gillespie that Mr. Ellerbe was
under his supervision and that he was living at the residence.
On Friday, Agent Mullany called Mr. Ellerbe and told him that he

would be out on Monday in the morning for a home visit and that he should be there so that he could perform the home visit.  He then called back Agent Gillespie to tell him that Mr. Ellerbe would be there on Monday morning for a home visit.

On late Friday afternoon, parole agents drove through that area and surveyed the residence.  There was no car.  They then went into the residence on the following Monday.  On the morning of September 12, Agent Gillespie and three agents went to the location.  They sent an agent to the rear of the location and Gillespie and two other agents knocked at the front door and identified themselves as state parole.  Mr. Ellerbe is obligated to admit parole agents when parole agents seek admission.  After several minutes, Mr. Ellerbe looked out the front window and did not answer the door.  This is a two story row home.  He was on the second floor looking out the front window.  The person at the rear told the agents at the front that the defendant also looked out the rear second floor window.  For several more minutes they continued to knock and announced themselves.  And, then the parole agents forced entry into the residence.  They encountered Mr. Ellerbe coming from the second floor.  They ordered him down and placed him in handcuffs.  They identified themselves again and explained to him that they were going to conduct a search and asked him if anyone else was in the residence.  Mr. Ellerbe stated that there was no one else there at which time they

conducted a security sweep to make sure that there were no other individuals or threats in the residence.

They were entering to conduct a search of the approved residence because based on the information they were provided, they believed that they had a reasonable suspicion to believe that Mr. Ellerbe had been in violation of his parole by being in possession of a firearm.  The defendant's actions in not answering the door made the agents believe that he was trying to hide something.

Michael Gmitter has been a parole agent for Pennsylvania for the last eight years.  He is currently assigned to the FAST Unit.  He participated in the search of the defendant's home on September 12.  There is an enclosed porch in the house and next to the front door is a long black coat that appeared to fit Mr. Ellerbe.  Inside the coat was a semi-automatic handgun magazine loaded with ten .45 hollow point rounds.  Upstairs on the second floor bathroom, they found a Taurus .45 black semi-automatic handgun loaded with ten .45 hollow point rounds.  The parole agents recovered some cash and a small amount of narcotics.  They turned everything over to the GVTF.

On Monday morning, September 12, 2012, Agents Schmidheiser and Henwood went to the location and arrived 15 minutes after state parole entered the defendant's location.

8

They went to Lamia Smith's location.  She was standing at the door looking down the street in the direction of Mr. Ellerbe's house and the parole agents.  She turned and looked in their direction and immediately started to cry and asked them to come into the house.  They entered the house.  She said "I know why you're here.  I know I shouldn't have bought him the guns.  The guns are down in his house.  I know that I did something wrong."  Agent Schmidheiser then told her that they would talk later and placed her into their vehicle.

On Monday, Agent Mullany received information from the Parole Board that they had performed a search of the residence and that they were holding Mr. Ellerbe.  He drove over to the residence and went inside.  Mr. Ellerbe was handcuffed and was in the dining room area sitting in a chair.  Agent Mullany spoke with Agent Gmitter who showed him a gun that was in a box and a clip that had been recovered from the residence.  Agent Mullany talked to the defendant and told him that he had gotten himself into some trouble and asked him what he was doing with the gun.  The defendant said that he had the gun because he was holding it for his girlfriend.  He said that apparently there was a rapist in the area and he was holding it for her safety.

At a hearing for the parole violation, Agent Mullany spoke with Mr. Ellerbe outside the hearing and the defendant told him that he never told him that he had the gun.  The detention

9

hearing was in early October.  Back in July, Mr. Ellerbe brought
in a copy of the lease.  He first came in with a lease that had
an address and then came back a week later with a different
addresss.

In consideration for being paroled, Mr. Ellerbe
consented to the search of his residence at any time and agreed
not to deny parole supervision staff access to his residence.
Mr. Ellerbe expressly agreed that:

> if I deny access [of my residence] to parole
> supervision staff, the laws of Pennsylvania
> give parole supervision staff the authority and
> responsibility to force entry to my residence
> to search for the offender or contraband
> without the need of a warrant.


II.  Analysis

The Fourth Amendment protects the right of private
citizens to be free from unreasonable government intrusions into
areas where they have a legitimate expectation of privacy.  See
U.S. Const. Amend. IV; Kyllo v. United States, 533 U.S. 27, 33-34
(2001).  Although warrantless searches generally are presumed
unreasonable, the law recognizes certain exceptions to this rule.
The probation system provides one such exception.  See Griffin v.
Wisconsin, 483 U.S. 868, 873-74 (1987).  The Supreme Court has
held that probation and parole are a conditional form of liberty,
and that the government must maintain a supervisory role with
respect to the probationer or parolee to ensure the safety of the

community.  Griffin, 483 U.S. at 874-75; see also, United States
v. Knights, 534 U.S. 112, 119 (2001) (recognizing that
probationers do not enjoy the liberty of other citizens), citing
Morrissey v. Brewer, 408 U.S. 471, 480 (1972).

Special conditions are imposed on the parolee to ensure
that a balance is achieved between the rehabilitative needs of
the parolee and the safety of the community.  Griffin, 483 U.S.
at 874-75.  Probation officers may conduct warrantless searches
of probationers and their residences based on "no more than
reasonable suspicion" of probation violations.  Knights, 534 U.S.
at 121; United States v. Baker, 221 F.3d 438, 443-44 (3d Cir.
2000).

The presence of reasonable suspicion is determined from
the totality of circumstances.  United States v. Arvizu, 534 U.S.
266, 273 (2002).  "[T]he likelihood of criminal activity need not
rise to the level required for probable cause, and it falls
considerably short of satisfying a preponderance of the evidence
standard."  Arvizu, 534 U.S. at 274, citing United States v.
Sokolow, 490 U.S. 1, 7 (1989).

Here, the parole agents had reason to believe that Mr.
Ellerbe violated parole by participating in the purchase of a
handgun.  The totality of the circumstances establishes a
reasonable basis to believe that the defendant used Lamia Smith
to purchase at least one handgun.

11

Agents Schmidheiser and Henwood learned that Lamia Smith purchased two handguns on two consecutive days at two different FFLs.  During the second purchase, the defendant remained outside in his car while Ms. Smith went in to purchase the gun.  He did not park in the lot but up the block where he would not be seen.  Ms. Smith did not have enough money to purchase the gun.  The agents saw her come out of the FFL and enter the defendant's car.  The defendant then drove Ms. Smith to a Wawa where there was an ATM.  The defendant entered the Wawa and Ms. Smith remained in the car.  Ms. Smith then returned to the FFL with enough money to complete the gun purchase.  She put the gun into the trunk of the defendant's car.  The defendant then drove Ms. Smith away from the FFL.  When his car was next seen, it was in front of his house.

Based upon this information, it was reasonable to believe there was a gun in the defendant's house.  The only other logical place it would be is in Lamia Smith's house.  As parole agents knocked and announced their presence at the defendant's home, the defendant saw them and heard them, but made no effort to admit the parole agents.  This conduct heightened the already reasonable belief held by the parole agents that the defendant was in violation of the conditions of his parole, thus supporting the warrantless search.

The supervising parole officer who authorized the search of the defendant's home received the information about the defendant's participation in the September 8, 2011, apparent straw purchase scheme from one of the agents who watched Ms. Smith and the defendant at the FFL on September 8, 2011.  The parole officer was told of Mr. Ellerbe's presence while Ms. Smith purchased the second of two guns, as well as the other information discussed above.  This parole officer and the GVTF officer had worked together previously.  The supervising parole officer who received the information from the GVTF officer reasonably relied upon the GVTF officer's information.

An appropriate order follows.